UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CAPITAL SECURITY SYSTEMS W.L.L.,

                       Plaintiff,                     16-cv-3687 (PKC)

        -against-                         FINDINGS OF FACT AND
                                                     <u>CONCLUSIONS OF LAW</u>

L-3 COMMUNICATIONS SECURITY AND
DETECTION SYSTEMS, INC.,[1]

                       Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        These are the Court's findings of fact and conclusions of law after a bench trial of

the claims of plaintiff Capital Security Systems W.L.L. ("Capital") against defendant L-3

Communications Security and Detection Systems, Inc. ("L-3"). Rule 52(a)(1), Fed. R. Civ. P. [2]

FINDINGS OF FACT

        1.      This action was removed from Supreme Court of the State of New York,

New York County based upon diversity of citizenship. Capital is a corporation organized under

the laws of, and with its principal place of business in, the State of Qatar. L-3 is a Delaware

corporation with its principal place of business in Massachusetts. The amount in controversy

exceeds the jurisdictional threshold.

        2.      Capital claims that it is owed commissions for its relationship assistance to

L-3 in connection with L-3's attempt to sell baggage scanning equipment known as "eXaminers"

---

[1] The Clerk is directed to conform the caption of the case to the above, which reflects the defendant as named in the
Notice of Removal. (Dkt. 1).
[2] The citation to any evidence is intended to be illustrative and is not necessarily the sole evidentiary support for a
finding. Any finding of fact improperly designated as a conclusion of law or vice versa should be considered under
the proper designation.

for use in an airport in Doha, Qatar.  Capital asserts claims against L-3 for breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing.

3.      The "eXaminer" is the trade name given to L-3's "level 3" scanning device.  A "level 3" device is not the ordinary X-ray scanner seen by the public at airports around the globe.  "Level 3" devices are more sophisticated equipment typically used after a preliminary scan or inspection is inconclusive as to the presence of explosives or other dangerous content.

4.      This dispute centers on Capital's right to commissions on sales of eXaminers at Hamad International Airport ("New Doha Airport").  Capital facilitated approximately two meetings in support of the sale of seven eXaminers for use in the outbound terminal at New Doha Airport.  L-3 does not dispute Capital's right to a commission on outbound terminal sales and has already partially paid Capital for these services.  But L-3 maintains that Capital had no role in and no foreknowledge of any of the other sales of eXaminers it made for use in other terminals of the New Doha Airport—an additional eight eXaminers—and is entitled to no commission on such sales.

5.      Capital claims that even if it had no advance knowledge or participation in the subsequent, non-outbound sales of eXaminers at New Doha Airport, it is entitled to commissions on such sales for two primary reasons.  First, Capital points to its prior role reselling and maintaining eXaminers for the airport operating in Doha prior to the construction of New Doha Airport (the "Old Doha Airport") as something that helped establish and maintain L-3's reputation in Qatar and among relevant Qatari authorities.  Second, Capital claims the subsequent sales were follow-on sales necessarily secured once the outbound deal was secured.

6.      The sale of equipment of this type to the airport authority in Qatar was heavily dependent upon relationships.  For example, Smiths, one of L-3's regional competitors, employed as its "representative" Abdullah Misnad, the brother-in-law of the Emir of Qatar.  (Tr. at 31–32).  Smiths enjoyed an 80–85% market share in those countries that are members of the Gulf Cooperation Council.  (Id.).

7.      Capital holds itself out as a Qatari engineering firm that produces and maintains security technology.  (Nahkle Direct ¶¶ 1, 4).[3]  Capital also represents companies outside of Qatar that seek to gain business in the Qatari security sector.  (Id. ¶ 4).   In this relationship-driven market, Capital had a key asset: its close affiliation with Ghanim Al Houdeifi.  (Tr. at 61–62).  At various points, Capital's General Manager Georges Nakhle referred to Al Houdeifi as Capital's "partner," "major shareholder," and "chairman."  (Nahkle Direct ¶ 1; Tr. at 59–60; DX 42 at C03321).[4]

8.      Al Houdeifi worked "around 30 years as [the] head of [the] Minister of Interior" in Qatar.  (Tr. at 60).  At the time Al Houdeifi held the position, the head of the Minister of the Interior oversaw the "army, the police, and the immigration department" of Qatar.  (Id.).  During all times relevant to this dispute, Al Houdeifi was retired from his position at the Minister of the Interior but continued to hold the title "Minister of State." (Id.).  Nakhle candidly acknowledged that the "influence" of Minister of State Al Houdeifi was a reason that Capital was able to facilitate sales of L-3's products at the Old Doha Airport.  (Id. at 61–62).  Nakhle's own training and experience were in accounting and financial planning.  (Nahkle Direct ¶ 3).

---

[3] At the Court's direction, each side presented the direct testimony of witnesses in written form, subject to live cross-examination and redirect.
[4] References to the December 5 and 6, 2017 trial transcript will be made as: "(Tr. at __)."  References to the January 29, 2018 trial transcript will be made as: "(Jan. 29 Tr. at __)."

9.      Neither side offered evidence as to the meaning or import of Al Houdeifi's status as "Minister of State" under the law of Qatar.  Even if it is accepted that there is an honorific component to the title, it is not clear from the evidence that the position is devoid of any status within the government.  (Tr. at 61–62).

10.      During the relevant time period, the CEO of the Old Doha Airport, the New Doha Airport, and Qatar Airways was a single individual, Akbar Al Baker.  (Nahkle Direct ¶ 18; Tr. at 18–19).  Nahkle described Al Baker as Capital's "biggest client."  (Tr. at 59).

11.      Capital first worked with L-3 in 2005, when Capital and another entity purchased L-3 baggage scanning machines, including an eXaminer, for resale to Old Doha Airport.  (Nahkle Direct ¶¶ 9–11).  Capital completed the resales and maintained the machines pursuant to a contract with Old Doha Airport.  (Nahkle Direct ¶¶ 13, 15; Frain Direct ¶ 4).  Capital purchased parts from L-3 so that it could maintain the Old Doha Airport machines.  (Frain Direct ¶ 4 n.3).  Capital maintained L-3 equipment at Old Doha Airport until 2013.  (Nahkle Direct ¶ 13; Tr. at 114).

12.      Al Baker, CEO of Qatar Airways and of Old Doha Airport, reached out to Capital with questions and concerns about L-3 equipment as they arose at Old Doha Airport.  (Nahkle Direct ¶ 18).  These questions sometimes took the form of urgent calls for service directly from Al Baker to Capital's Nakhle.  (Id.).  Capital understood that its job at Old Doha Airport was to "keep the Old Doha Airport management and personnel happy with the service and maintenance of the L-3 baggage scanning machines" and to keep "the reputation of L-3 . . . strong in Qatar."  (Id. ¶ 16).

13.      In 2007, Al Baker expressed discontent with the performance of L-3's machines at Old Doha Airport.  (Nakhle Direct ¶ 19; PX 60).  Capital facilitated a meeting

between Capital, L-3, and Al Baker to assure Al Baker that unsatisfactory performance issues were not the fault of L-3's equipment.  (Id.; PX 62).

14.     Because Al Baker had made clear his unfavorable opinion of the performance of L-3 equipment at Old Doha Airport on a few occasions, L-3 perceived Al Baker to be an obstacle to its success in Qatar.  (Tr. at 196).  For example, L-3 management had difficulty reaching Al Baker directly, and Al Baker declined to contract with other divisions of L-3 for other work in Qatar.  (Id.).  L-3 perceived Al Baker's attitude towards L-3 to be unwavering during the relevant time period.  (Id.).

15.     In the mid-2000s, the government of Qatar began planning the construction of a new airport, again under the leadership of Al Baker.  (Bou Doumit Direct ¶ 13; Frain Direct ¶ 5).  The construction of the New Doha Airport created opportunities for the sale of baggage scanning systems.  (Frain Direct ¶¶ 5–6).

16.     In or about July 2007, L-3 engaged Capital as its representative for the sales of its equipment at New Doha Airport on a commission basis, rather than as its direct reseller.  (Nahkle Direct ¶¶ 30–33; Frain Direct ¶¶ 32–33).  Capital understood that L-3 wanted an "all-encompassing" arrangement with Capital as its representative on the New Doha Airport project, but "did not want to make a commitment at that time to pay Capital beyond the initial order of seven eXaminer machines."  (Nahkle Direct ¶ 37).  An email from L-3's Jim Gaudoin to Capital's Nakhle dated July 25, 2007 stated that

> Commissions for the [New Doha Airport] . . . are confirmed at . . . 5% on the supply of eXaminer products.  The volumes of these products are not as yet fully confirmed[;] the same for the final bid pricing. This is now subject to agreements with [Crisplant], the contractor and contract award from the end-user.  Commission to Capital will be payable following the success of [L-3] in this project and after [L-3] has received full payment for the aforementioned

systems. No commission is payable for any subsequent systems
purchased outside of the initial [New Doha Airport] contract award.

(PX 5). The "initial . . . contract award" referred to sales of eXaminers for use in the outbound terminal. (PX 5; Nahkle Direct ¶ 37; Tr. at 68, 187).

17. FKI Logistex A/S ("Crisplant") was an entity bidding for the contract to install the entire baggage conveyor system at New Doha Airport, including its security screening components. (Frain Direct ¶ 9). This role is also referred to as an "integrator." (Tr. at 12).

18. Even though the integrator would have direct purchasing authority for "level 3" scanners and similar equipment, Capital arranged and participated in meetings between L-3 and representatives of New Doha Airport and Qatar Airways. (Frain Direct ¶ 48; Tr. at 210). At least one meeting occurred between Al Baker, CEO of Qatar Airways, and Capital's Ghanim Al Houdeifi, regarding L-3's products and reputation. (PX 108).[5]

19. By virtue of L-3's winning bid to Crisplant and Crisplant's winning bid to New Doha Airport, L-3 won the right to have seven eXaminers installed in the outbound terminal of New Doha Airport. (Frain Direct ¶¶ 9–11, 13). L-3 believed that, by facilitating and participating in meetings with New Doha Airport officials, Capital had earned a commission on the sale of seven eXaminers for the outbound terminal. (Frain Direct ¶¶ 48, 58–59; Tr. at 129).

20. In 2008, L-3 entered into an agreement with Crisplant covering Crisplant's initial order of seven eXaminers (the "Crisplant Agreement," (PX 9)). L-3 and Crisplant contemplated that they may win additional business together as part of the New Doha Airport construction of additional terminals or areas beyond the outbound terminal. (Id.; Tr. at

---

[5] At trial, L-3 objected to the admissibility of Capital's Exhibit 108 as barred by the Court's preclusion of the testimony of Al Houdeifi for his failure to complete his deposition in this case, and the Court reserved its decision on the objection. (Tr. at 107; DX 62; Dkt. 21). The objection is without merit. The Court's ruling to preclude testimony does not take within its sweep Capital's Exhibit 108, which is documentary evidence regarding a meeting between Al Houdeifi and Al Baker.

132–33).  The Crisplant Agreement fixed the price Crisplant would pay for L-3 equipment for additional equipment orders for a specified term.  (PX 9 ¶¶ 11–12).

21.     The New Doha Airport, like other airports around the world, could rationally select different integrators or equipment manufacturers for different terminals in order to obtain the lowest price, even if that meant they had L-3's eXaminers in one terminal and competitors' level 3 equipment in others.  (Tr. at 145–50, 201–03).  Accordingly, Crisplant and L-3 could and did face competition from other integrators and manufacturers for each subsequent terminal.  (Frain Direct ¶ 26; Tr. at 174–75, 194–96).

22.     The Crisplant Agreement was not an exclusive arrangement between Crisplant and L-3.  (See PX 9).  To the contrary, another baggage integrator and competitor of Crisplant proposed L-3 eXaminers as the "level 3" scanners in its bid for the Emiri terminal.  (Frain Direct ¶ 26; DX 9).  Crisplant also considered competitors of L-3 for certain non-outbound bids.  (DX 11; Tr. 197–98).

23.     In light of this competition, L-3 sought influence or relationship assistance in support of its subsequent bids on New Doha Airport sales.  (Tr. at 143).

24.     On June 10, 2010, Capital and L-3 entered into a two-year International Representative Agreement (the "2010 Representative Agreement") which contained an integration clause stating that it "supersede[d] any and all prior oral and written statements, understandings[,] and agreements with respect to the rendering of representation [s]ervices" by Capital to L-3.  (2010 Representative Agreement (DX 1) ¶ 26).

25.     On its face, the 2010 Representative Agreement gave Capital the opportunity to earn a 5% commission on the net sales price of any eXaminers sold for use in Qatar.  (2010 Representative Agreement ¶ 4, App'xs A & B).  It conditioned any commission to

Capital on Capital's fulfillment of the "Representative Services" in connection with each sale. (Id. ¶ 4(A)).  The Representative Services required Capital to provide certain reports, such as:

- "periodic written reports delivered on a timely basis of customer plans, requirements, and budgetary changes for Products and Services;"

- "quarterly reports and information" concerning sales opportunities; and

- "information concerning the activities of [L-3's] competitors, [Capital's] evaluation of competitors, the status of their proposals, and customer assessment of their proposals relative to those of [L-3]."

(Id. ¶ 1(C)).  The Representative Services also required Capital to provide L-3 with certain relationship services, such as:

- "maintain[ing] continuous liaison with customer decision makers;" and

- "[a]dvis[ing] the customer concerning selection of Products and Services," such as eXaminers.

(Id.).

26.     The 2010 Representative Agreement does not define the word "customer" as used therein.

27.     L-3, bound by good faith and reasonableness, retained the discretion to decide whether Capital was entitled to a commission with respect to each sale based on its fulfillment of the Representative Services under the 2010 Representative Agreement.  (2010 Representative Agreement ¶ 4).

28.     The 2010 Representative Agreement contained a non-waiver of breach provision that purported to preserve each party's rights if not asserted at the time of a breach. (2010 Representative Agreement ¶ 19).  The 2010 Representative Agreement also prohibited

Capital from providing services to any competitor of L-3 for the term of the contract plus one year. (Id. ¶ 3).

29. After being asked whether Al Houdeifi's ownership stake in and relationship to Capital motivated L-3 to enter into the 2010 Representative Agreement, L-3's William Frain testified as follows:

> THE COURT: All right. If you had simply paid Capital, you and
> your company would have a Foreign Corrupt Practices Act
> problem in paying them, correct?
> THE WITNESS: Prior to 2010?
> THE COURT: Yes.
> THE WITNESS: Yes.
> THE COURT: So entering into this agreement gave your company
> cover for any kind of an allegation that you had violated the
> Foreign Corrupt Practices Act[?]
> THE WITNESS: Yes.

(Tr. at 125–26).

30. Capital viewed the 2010 Representative Agreement as "ignor[ing] the actual relationship between the parties" to the extent it suggested that either party expected Capital to provide the Representative Services to L-3 in order to earn commissions. (Nakhle Direct ¶ 112).

31. L-3 also believed that the actual deal it reached with Capital—in effect since at least 2007—was different from the stated terms of the 2010 Representative Agreement; Capital would only be involved in assisting L-3 on sales for the outbound terminal and would have no involvement in subsequent sales. (PX 49 at L0000366; Jan. 29 Tr. at 10, 13).

32. L-3 sold a total of fifteen eXaminers for use in New Doha Airport. (Tr. at 154). In addition to the seven eXaminers for use in the outbound terminal, L-3 sold an additional eight eXaminers for other areas of New Doha Airport: two for the inbound terminal, three for the

Emiri terminal, and three for the Airline Engineering and Operations ("AOF" or "Crew") terminal. (Tr. at 152–54).

33.     Capital did not fully perform its obligation to provide the Representative Services under the 2010 Representative Agreement. (Frain Direct ¶¶ 35–44). Capital admits to failing to providing the required periodic reporting required by the Representative Services. (Tr. at 45–46). Capital did not provide any relationship services required by the Representative Services with respect to non-outbound sales. (Frain Direct ¶ 48; Tr. at 53–54).

34.     L-3 did not complain to Capital about its noncompliance with the Representative Services. (Frain Direct ¶ 51; Nakhle Direct ¶¶ 64, 67). Instead, L-3 extended the 2010 Representative Agreement upon its expiration for one year through three letter agreements. (Tr. 154–55).

35.     Again despite Capital's failure to perform the Representative Services, in July 2013, L-3 and Capital entered into a new International Representative Agreement (the "2013 Representative Agreement" (DX 2)). The 2013 Representative Agreement extended L-3 and Capital's representative relationship until 2015 and again premised commissions on the obligation to provide Representative Services. (Id. ¶¶ 2, 4). Like the 2010 Representative Agreement, the 2013 Representative Agreement does not define the term "customer." The 2013 Representative Agreement also extended Capital's non-compete covenant until 2016. (Id. ¶ 3).

36.     L-3 still did not complain to Capital about its failure to provide the Representative Services through the term of the 2013 Representative Agreement. (Nakhle Direct ¶ 82; Tr. at 158). Although both agreements provided L-3 with the option to terminate the agreements for cause based on a failure to perform Representative Services, L-3 did not

terminate either contract. (2010 Representative Agreement ¶ 12(B)(III); 2013 Representative Agreement ¶ 12(B)(III); Tr. at 170).

37. L-3 knew that Capital was not complying with the Representative Services through the term of the 2010 Representative Agreement and 2013 Representative Agreement. (Frain Direct ¶¶ 37, 45).

38. Capital's claims do not arise under the 2013 Representative Agreement. (Tr. at 43–44).

39. Capital attended approximately two meetings with airport officials in connection with the sale of the seven eXaminers for use in the outbound terminal. (Frain Direct ¶ 48). Although any tangible contribution by Capital as L-3's representative ceased after the outbound meetings with airport officials, L-3 believed that having some sales representation in Qatar was better than having no sales representation. (Id.; Tr. at 143–45).

40. Capital understood that the scope of its work for L-3 was to "keep [the] L-3 name very well in the old airport, and do the political lobbying on the top management of Qatar Airways and the airport. That's it." (Nakhle Dep. at 72). Even under that view, in order to earn a commission on competitive non-outbound sales, it was not sufficient for Capital to sit by and do nothing unless and until asked. (Tr. at 26–27, 53–54). Unlike the instance of the seven units for the outbound terminal where Capital attended meetings with airport officials, Capital did nothing as to the sales of eight units for use in other non-outbound terminals of the New Doha Airport. (Frain Direct ¶ 48). It had no foreknowledge that units were needed or that opportunities to bid on non-outbound terminals were arising. (Tr. at 7–8, 12–13). Capital failed to prove by the preponderance of the credible evidence that it had any role whatsoever in the sale

of any L-3 product for use in the New Doha Airport other than the seven units to be placed in the outbound terminal.

41.     The relationship between L-3 and Capital soured as Capital learned of L-3's sales for use in terminals other than the outbound terminal at New Doha Airport and L-3's intention to pay no commission on those sales.  (Nakhle Direct ¶¶ 74–76).

42.     After learning that L-3 did not intend to pay commissions on the additional eXaminers, Capital communicated to L-3 its plan to submit an "Accusation File" to Qatari and American government officials and eventually to Al Baker.  (DX 42 at C03323–24).

43.     In 2015, L-3 informed Capital that the arrangement was, and had always been, that "[Capital] would be involved in developing the *initial* Outbound sale but would have no involvement in developing further business at the airport."  (PX 49 (emphasis in original); Nakhle Direct ¶ 76).

44.     L-3 understood that it reached an agreement, reflected in the email of July 25, 2007, (PX 5), to pay Capital a 5% commission on outbound sales and believed that such obligation arose under an understanding reached with Capital prior to the execution of the 2010 Representative Agreement, rather than the 2010 Representative Agreement (Tr. at 128).

45.     Both the July 25, 2007 email and the 2010 Representative Agreement premise the calculation and payment of commissions by L-3 to Capital on the receipt of payment from Crisplant to L-3.  (PX 5; 2010 Representative Agreement ¶ 4(B)).

46.     L-3 has already paid $491,280 to Capital on the outbound contracts as part of its 5% commission on the amount received by Crisplant in connection with such sales. (Speakman Direct ¶¶ 24, 29).  The amounts L-3 already paid include $382,678 for equipment, $9,625 in project management fees, and $98,977 in defect liability period ("DLP") fees.  (Id.).

47.     L-3 admitted that it still owes $127,116 to Capital on outbound sales in connection with amounts paid by Crisplant for equipment, DLP fees, thirteen-month interim operations and maintenance ("O&M") fees, and five-year O&M services.  (Speakman Direct ¶¶ 29–30).  This amount totals the $25,402 owed in equipment commissions, $26,752 owed in DLP commissions, $36,968 owed in thirteen-month interim O&M commissions, and $37,994 owed in five-year O&M commissions.  (Id.).

48.     The amounts it has paid and admits are owing are calculated as a 5% commission on amounts received by L-3 from Crisplant in connection with the outbound units.  (Speakman Direct ¶¶ 24, 29–30).

49.     The five-year O&M period began on July 29, 2015, and L-3 admits that it owes up to an additional $122,781 in commissions to Capital on the remaining services L-3 will provide to Crisplant, calculated based on the fee L-3 expects to receive from Crisplant.  (Speakman Direct ¶¶ 26–28, 29(e), 30).  That amount could be reduced if Crisplant makes deductions from the amounts it is supposed to pay to L-3, as it has in the past.  (Id. ¶¶ 28–30).

50.     The 2010 Representative Agreement entitles L-3 to "set-off any amount owing or damages due at any time from [Capital] to [L-3] against any amount payable by [L-3] in connection with this Agreement."  (2010 Representative Agreement ¶ 15).  Under the terms of the agreement reflected in the email of July 25, 2007 (PX 5) and prior to the execution of the 2010 Representative Agreement, the parties did not manifest any intent to permit the set-off of claims in connection with their representative relationship at New Doha Airport with those in connection with their prior resale relationship at the Old Doha Airport.

CONCLUSIONS OF LAW

51.     This Court has subject matter jurisdiction. 28 U.S.C. § 1332(a)(2).

- 13 -

52.     The 2010 Representative Agreement and 2013 Representative Agreement select New York law as the governing law without reference to New York's conflict of law rules. (2010 Representative Agreement ¶ 16; 2013 Representative Agreement ¶ 16).

53.     The parties brief all claims under New York law, and such "implied consent . . . is sufficient to establish choice of law." See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (omission in original) (quoting Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).

54.     On the claims for breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing, Capital has the burden of proving each element of each claim by the preponderance of the evidence.

55.     To recover for breach of contract under New York law, "a plaintiff must prove, by a preponderance of the evidence[:] (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011).

56.     As to the existence of a contract, "a writing is conclusive only so far as the parties intend it to be the authoritative memorial of the transaction." In re H. Hicks & Son, 82 F.2d 277, 279 (2d Cir. 1936). In other words, an otherwise valid contract is unenforceable "if they agree that their words, however coercive in form, shall not bind them." Id. Parol evidence is ordinarily inadmissible to vary a bargain reduced to writing, it is always admissible to show that the terms of the writing do not reflect an actual agreement between the parties. Ohanian v. Avis Rent A Car Sys., Inc., 779 F.2d 101, 108 (2d Cir. 1985); Polygram Holding, Inc. v. Cafaro, 42 A.D.3d 339, 340 (1st Dep't 2007) (parole evidence admissible to show sham nature of

otherwise unambiguous writing). It is thus admissible to show that the parties entered into a writing as a "disguise to deceive others." H. Hicks & Son, 82 F.2d at 279; accord Cafaro, 42 A.D.3d at 340.

57. The 2010 Representative Agreement, which purported to govern the payment of commissions to Capital for all eligible sales of L-3 equipment in Qatar, was not intended to be the actual agreement between the parties. (See 2010 Representative Agreement App'x A ¶ 3).

58. Frain testified that entering into the 2010 Representative Agreement helped rid L-3 of any suggestion that it was paying Capital merely for its connection to or influence with Qatari officials. (Tr. at 125–26). It is not inherently a frustration of federal or New York policy to pay private individuals or entities for their assistance in procuring government contracts, though it may be. See, e.g., Kashfi v. Phibro-Salomon, Inc., 628 F. Supp. 727, 739–40 (S.D.N.Y. 1986) (discussing application of federal public policy to agent's claim for contingent compensation in connection with securing foreign government contract); Leahy v. Brooklyn Waterfront Terminal Corp., 272 A.D. 781, 781 (2d Dep't 1947) (domestic government contract under both policies). Nevertheless, L-3 did not want to create even the suggestion of improper payments or conduct. As noted, Al Houdeifi was a major shareholder of Capital and continued to hold the title of "Minister of State." A payment to a foreign government official under certain circumstances could be a violation of the Foreign Corrupt Practices Act. 15 U.S.C. §§ 78dd–1, *et seq.*

59. Neither party expected that Capital would perform the contractually defined Representative Services, upon which the payment of a commission purportedly rested. Nakhle candidly testified that any suggestion that Capital failed to perform the Representative

Services is misguided because it "ignores the actual relationship between the parties." (Nakhle Direct ¶ 112). Capital understood that it had a "political lobbying" arrangement with L-3 and believed that it was entitled to a commission regardless of whether or not it provided any services in furtherance of a specific sale. (Tr. at 26–27; Nahkle Dep. at 72).

60. On the other hand, L-3 did not expect any particular services from Capital. (Tr. at 143–45). L-3 knew that Capital was not complying with the Representative Services purportedly at the core of their bargain, but never complained to Capital. Yet L-3 repeatedly extended the putative contract for a term of five years. (Tr. 158).

61. In more recent dealings with Capital and again at trial, L-3 took the position that it struck a different deal with Capital that was effective all along; Capital would only be involved in outbound sales and, from then on, L-3 would pursue all further sales without the involvement of Capital. (PX 49 at L0000366; Jan. 29 Tr. at 10, 13). This evidence supports the Court's conclusion that the 2010 Representative Agreement—a contract purportedly offering Capital the opportunity to earn commissions on the sales of all eXaminers in Qatar for the covered period based on services rendered—fails to reflect an actual agreement between L-3 and Capital. If L-3 expected Capital to provide no tangible services and have no involvement after the sale of outbound units, the 2010 Representative Agreement is not a writing manifesting the actual bargain of the parties. The Court comfortably concludes that the 2010 Representative Agreement was not the true bargain between the parties.

62. The arrangement between L-3 and Capital is instead evidenced by L-3's July 25, 2007 email to Capital. (PX 5). It establishes an enforceable obligation between the parties. See Kolchins v. Evolution Markets, Inc., 128 A.D.3d 47, 59 (1st Dep' 2015), aff'd, 31 N.Y.3d 100 (2018) (enforceable agreement requires offer, acceptance, consideration, mutual

assent, and intent to be bound). Its purported integration into the 2010 Representative Agreement is of no moment where, as here, the Court has found the 2010 Representative Agreement not to be an enforceable contract.

63. As noted above, the July 25, 2007 email is limited to outbound sales. Capital is, on that basis, entitled to no commissions on non-outbound sales, which includes no commission on eXaminers sold for use in the inbound, Emiri, or AOF terminals.

64. As to sales of outbound units, Capital performed its obligations to provide relationship support to L-3 under the July 25, 2007 agreement by facilitating meetings.

65. Capital argues that because the Crisplant Agreement covered the seven eXaminers in the outbound terminal and Capital is entitled to a commission on those sales, then it necessarily follows that Capital is entitled to a commission on any subsequent sale in the New Doha Airport. The pricing and other terms of these subsequent sales were governed by the Crisplant Agreement but, as discussed above, there was competition for these subsequent sales in other terminals of the airport. Neither Crisplant nor L-3 were assured of anything. An agreement between Crisplant and L-3 that provides terms for sales in the event they are successful in making sales is a long way from the consummation of actual sales. That the subsequent sales were in the form of "Change Orders" under the Crisplant Agreement does not alter the fact that Capital had nothing to do with them.

66. Capital failed to prove by a preponderance of the evidence that the additional sales of the eight eXaminers were simply follow-on sales to the initial sale of seven units for the outbound terminal. Again, L-3 and Crisplant faced competition from manufacturers and integrators. Capital did not demonstrate that any work by Capital in furtherance of the outbound sales played a role in these subsequent sales. There was, for example, no evidence that

L-3's association with Capital was important to New Doha Airport on non-outbound sales, or that L-3 held out Capital as its representative in furtherance of the same sales.

67.     Similarly, Capital failed to prove that its work with L-3 equipment at the Old Doha Airport had anything to do with its ultimate success with Crisplant or with New Doha Airport generally.  The common leadership of Al Baker, without more, is insufficient to overcome L-3's credible showing that the New Doha Airport deals were competitive and not guaranteed sales for L-3.

68.     As an alternative holding, if the 2010 Representative Agreement was a valid, binding agreement, Capital has failed to prove an entitlement to commissions on the eight eXaminers used in locations other than the outbound terminal.  If the Representative Services were true obligations imposed on Capital, it failed to fully perform them.  Separate and apart from Capital's failure to perform the Representative Services, the Court finds that Capital did not perform any services in furtherance of the sales of the eight additional eXaminers.  (Frain Direct ¶ 48).  Capital did not have foreknowledge of the opportunity to bid on the units for non-outbound terminals.  (Tr. at 7–8, 12–13).  As to the sales of seven eXaminers for use in the outbound terminal, despite the existence of the non-waiver provision of the 2010 Representative Agreement, L-3 unequivocally evinced an intent to waive the prerequisite of nonperformance of the Representative Services based on the meetings Capital arranged with airport officials.  <u>See Taylor v. Blaylock & Partners, L.P.</u>, 240 A.D.2d 289, 290 (1st Dep't 1997).  L-3's conduct and communications to Capital uniformly indicated that it would pay a commission on outbound, consistent with this prior understanding based on the services that the parties agreed that Capital actually rendered toward sales of outbound units.  (Tr. at 128).

69.     Capital attempts to excuse its failure to perform any Representative Services as to sales other than outbound services by asserting that it was not permitted to speak with New Doha Airport or Crisplant or anyone else.  The 2010 Representative Agreement and 2013 Representative Agreement provide that "it is not authorized to represent or speak on behalf of [L-3] in [Qatar] in relation to any third parties, unless otherwise directed in writing by [L-3]." (2010 Representative Agreement ¶ 1(B)); 2013 Representative Agreement ¶ 1(D)).  But the very same agreements required Capital to "maintain continuous liaison with customer decision makers" and "[a]dvise the customer concerning selection of Products and Services."  ((2010 Representative Agreement ¶ 1(C)); 2013 Representative Agreement ¶ 1(E)).  The Court construes the 2010 Representative Agreement to mean that conversations in furtherance of the liaison role or to "advise the customer" were carved out of the general prohibitions on speaking to third parties.  The Court construes the term "customer decision makers" to be broad enough to include officials of the airport authority, Crisplant, and competitors of Crisplant potentially including L-3 products in their bids.  As the Court already found, Capital did not maintain a continuous liaison with any customer decision makers.

70.     Capital failed to prove its claim for a breach of the implied covenant of good faith and fair dealing.  Under New York law, the implied covenant of good faith and fair dealing is "implicit in every contract," Jordan v. Verizon Corp., 08 cv 6414 (GEL), 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008), but there must be an enforceable contract to sustain an action for breach of the implied covenant, United Magazine Co. v. Murdoch Magazines Distribution, Inc., 146 F. Supp. 2d 385, 405 (S.D.N.Y. 2001), aff'd sub nom. United Magazine Co. v. Curtis Circulation Co., 279 F. App'x 14 (2d Cir. 2008).  Where it applies, "[t]he implied covenant 'can only impose an obligation consistent with other mutually agreed upon terms in the

contract.'" Broder v. Cablevision Systems Corp., 418 F.3d 187, 198–99 (2d Cir. 2005) (quoting Geren v. Quantum Chem. Corp., 832 F. Supp. 728, 732 (S.D.N.Y. 1993)).  The July 25, 2007 email expressly limits Capital's involvement as L-3's representative to outbound sales; Capital therefore cannot claim that L-3 improperly withheld information about or commissions on subsequent non-outbound sales on that basis.  See id.  L-3 did not impermissibly deprive Capital of the fruit of its bargain.  See Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc., 97 A.D.3d 781, 784 (2d Dep't 2012).

71.     The 2010 Representative Agreement is not an enforceable contract and so a claim for breach of the implied covenant cannot arise from that putative arrangement.  See United Magazine Co., 146 F. Supp. 2d at 405.

72.     With respect to the Court's alternative holding that the 2010 Representative Agreement was an enforceable contract, Capital failed to perform the required Representative Services and L-3 did not unreasonably exercise its discretion that Capital therefore not entitled to commissions.  (2010 Representative Agreement ¶¶ 1, 4).  Capital failed to prove by a preponderance of the evidence that L-3 breached the implied covenant.  Capital further failed to prove that L-3 implicitly deprived Capital of the fruit of its bargain as to non-outbound sales because Capital did not perform the Representative Services in furtherance of such sales and made no attempt to do so.  See Elmhurst Dairy, 97 A.D.3d at 784.

73.     Capital failed to prove L-3 was unjustly enriched by their association as to the non-outbound sales.  "Unjust enrichment occurs when a defendant enjoys a benefit bestowed by the plaintiff without adequately compensating the plaintiff."  Swain v. Brown, 135 A.D.3d 629, 632 (1st Dep't 2016).  Capital has not satisfied its burden of establishing any cognizable benefit it conferred to L-3 through Capital's association with L-3 or through Capital's activities

on its behalf with respect to the non-outbound sales at issue in this case. Capital failed to prove by a preponderance of the credible evidence that L-3 would not have been able to make sales of eXaminers to New Doha Airport without efforts by or association with Capital. As L-3 attempted to make these sales, Capital took no action to further the sales efforts—or even know that there were additional opportunities to sell level 3 units to New Doha Airport. In sum, Capital failed to prove that L-3's continued association with Capital in fact bore on its relationship with Crisplant or on Crisplant's selection by New Doha Airport officials for subsequent contracts.

74. Capital has proven contract damages of $127,116, representing a 5% commission on amounts paid by Crisplant to L-3 for equipment, DLP fees, thirteen-month interim O&M fees, and five-year O&M fees on outbound sales.

75. The Court further awards damages of $122,781 to Capital on remaining five-year O&M services for the outbound terminal. L-3 has admitted it owes or will owe Capital up to an additional $122,781 on outbound sales, representing a 5% commission on the expected fee from Crisplant for remaining five-year O&M services for the outbound terminal. Even though L-3 is not obligated to calculate and pay a commission to Capital until the underlying payment is received from Crisplant, (PX 5), L-3 and Capital propose that the Court include the $122,781 payment in determining the scope of its obligations to Capital, (Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 275; id. ¶¶ 281–82 (proposing that the Court decline to order prejudgment interest because of the entry of an order to pay five-year O&M amounts not yet due, among other reasons); see Pl.'s Proposed Conclusions of Law ¶ 6). These amounts are due and owing under a theory of anticipatory breach. See Kaplan v. Madison Park Grp. Owners, LLC, 94 A.D.3d 616, 618 (1st Dep't 2012).

76.     In the absence of a basis to conclude that L-3 is entitled to set-off amounts owed under the New Doha Airport representative relationship with Capital using amounts owed under the Old Doha Airport resale relationship with Capital, the Court declines to order set-off payments.  (Suppl. Decl. of Bou Doumit Direct ¶¶ 62–63; Speakman Direct ¶ 29(f); Pl.'s Proposed Findings of Fact ¶ 103; Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 191).

77.     New York law requires the award of prejudgment interest at a statutory rate of 9% per year on breach of contract claims.  N.Y. C.P.L.R. §§ 5001, 5004.

78.      "New York law does not permit the trial court to exercise any discretion where a party is entitled to [prejudgment] interest as a matter of right."  New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599, 603 (2d Cir. 2003).

79.     When "damages were incurred at various times, interest shall be computed upon each item from the date it was incurred *or upon all of the damages from a single reasonable intermediate date*."  N.Y. C.P.L.R. § 5001(b) (emphasis added).  In such a circumstance, the Court has "wide discretion in determining a reasonable date from which to award prejudgment interest."  Conway v. Icahn & Co., 16 F.3d 504, 512 (2d Cir. 1994).

80.     Neither party has provided the Court with much assistance in ascertaining the date from which prejudgment interest should be calculated for sales for use in the outbound terminal.  (Pl.'s Proposed Conclusions of Law ¶ 6; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 277–83).  Capital argues in briefing that the Court should use the date of January 1, 2011 based on the testimony of Chris Speakman of L-3 that it received the last outbound payment "years ago."  (Pl.'s Post-Trial Mem. of Law at 33; Jan. 29 Tr. at 36).  L-3

proposes the date of commencement of the action. (Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 281–82).

81.     The Court finds that January 20, 2015 is a reasonable intermediate date on which to calculate the 9% prejudgment interest solely as to the $127,116 in damages. L-3 made commission payments to Capital on outbound contracts in installments between 2010 and 2015. (Nakhle Direct ¶ 70). L-3 was billing Crisplant for certain outbound amounts owed during that period. (PX 128 at C02752). L-3 negotiated a closeout or settlement with Crisplant regarding certain deductions Crisplant would make against amounts Crisplant owed to L-3 for outbound sales. (DX 37; Speakman Direct ¶¶ 23–24). The closeout was reached on or about January 20, 2015 and finalized many of the amounts Crisplant would actually pay to L-3 for equipment and services rendered for outbound units. (PX 128 at C02749; Speakman Direct ¶ 24). L-3 communicated the outcome of the closeout to Capital on or about July 10, 2015. (DX 37). The chart included as part of L-3's Exhibit 37 details the closeout amount as to outbound and other sales, but does not include five-year O&M amounts because the five-year O&M period began July 29, 2015. (Speakman Direct ¶¶ 26–27). The action was commenced in state court on April 22, 2016 and removed to this Court on May 17, 2016. (Dkt. 1).

82.     Capital failed to prove its entitlement to prejudgment interest as to the $122,781 commission on the remaining five-year O&M services because it offered no proof that L-3 has yet received these amounts from Crisplant.

83.     Post-judgment interest applies by operation of law. N.Y. C.P.L.R. § 5003.

84.     Accordingly, Capital is entitled to damages of $249,897, representing $127,116 in outbound commissions and $122,781 in projected remaining commissions on five-

year outbound O&M.  Capital is also entitled to 9% annual prejudgment interest only on the $127,116 to be calculated beginning January 20, 2015.

Plaintiff has proven by a preponderance of the evidence a breach of contract by L-3 to pay commissions on sales of eXaminer units for use in the outbound terminal of New Doha Airport and damages proximately caused by the breach in the amount of $127,116.  Plaintiff has proven its entitlement to 9% annual prejudgment interest on the $127,116 to be calculated beginning January 20, 2015.  Plaintiff has also proven $122,781 in damages under an anticipatory breach theory with no prejudgment interest as to that amount.  Plaintiff failed to prove any other claim for breach of contract, failed to prove a breach of the implied covenant of good faith and fair dealing, and failed to prove that L-3 was unjustly enriched.  Capital is directed to submit a proposed judgment to the Court within seven (7) days, consistent with the foregoing.

The Clerk is respectfully directed to conform the caption of the case to the above, as noted on page 1, footnote 1.


SO ORDERED.


P. Kevin Castel
United States District Judge


Dated: New York, New York
        September 28, 2018